**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220094-U

Order filed February 17, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0094<br>Circuit No. 20-CF-339 |
| | ) | |
| KEVIN J. PAULSEN, | ) ) | Honorable<br>H. Chris Ryan, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Albrecht and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The prosecutor's closing argument was not improper, and therefore, the defendant was not denied a fair trial.

¶ 2    The defendant, Kevin J. Paulsen, appeals from his convictions for aggravated criminal sexual assault and aggravated criminal sexual abuse, arguing that he was denied a fair trial where the prosecutor misstated evidence during closing arguments.

¶ 3                                        I. BACKGROUND

¶ 4    In 2020, the defendant was charged with aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(5) (West 2020)) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(3) (West 2020)) in that he placed his fingers in the vagina and licked the breast of Sharon B., who was over 60 years of age.

¶ 5    The matter proceeded to a jury trial in October 2021. Sharon testified that she was 72 years old. On Friday, July 24, 2020, she was at home in her trailer in Seneca, Illinois. She had fallen asleep in a chair in the living room and was awoken by a blanket over her head. Once she got the blanket off, she realized a man was licking her right breast and had his fingers up her vagina. Sharon started to fight the man, attempting to grab his short hair or any of his clothing. She was able to scratch the man. She had COPD and was having trouble breathing. Sharon stated, "I can't breathe." The man then jumped up and ran. She did not hear a vehicle start. She then called her neighbor, who came over and called the police. It was dark in the trailer, so she was unable to see the man, but was able to describe him as a big, bulky man with very short hair. She later went to the hospital for a rape kit and DNA swabs. She had never met the defendant before.

¶ 6    Celia Rademacher stated that she was a registered nurse, was trained in the use of sexual assault kits, and performed a kit on Sharon, which included swabs of her vagina, right breast, and right thumb and scrapings of her fingernails. David Ortiz testified that he was a chief deputy with the La Salle County Sheriff's Office and was dispatched to the scene. Ortiz spoke with the defendant on July 28, 2020. The defendant was living with his parents in the same trailer park as Sharon at the time. Ortiz stated that the defendant was a big guy with very short hair, which matched Sharon's description. He later obtained buccal swabs from the defendant and from another suspect, Steven Workman.

2

¶ 7        Lyle Boicken testified that he was a forensic scientist for the Illinois State Police Crime Laboratory. He was tendered as an expert in the field of forensic biology and DNA analysis. He performed an analysis of the DNA in this case. He first tested the vaginal swabs, but no male DNA was detected in those samples. Boicken stated that this was unsurprising as Sharon had used the restroom before the swab was taken. Male DNA was detected on the right breast swab, the right thumb swab, and the right-hand fingernail scrapings. Boicken tested those DNA samples against the DNA profiles from the buccal swabs from the defendant and Workman. The defendant's DNA was a "complete match" to the DNA found on Sharon's right breast, to the statistical frequency of 1 out of 52 quadrillion. In other words, Boicken stated, "You would expect to observe this profile one time out of 52 quadrillion individuals." The defendant's DNA was included to a lesser degree in the swab from Sharon's right thumb, as a smaller amount of DNA was found. Boicken stated he would expect to observe this profile "one time in 160,000 unrelated individuals." The defendant's DNA was also included in the DNA found in the fingernail scrapings. Boicken stated he would "expect this profile to be observed one time in 20 octillion individuals, unrelated individuals." The defendant's DNA matched at all 23 loci, which was "as good as it gets." Workman's DNA was excluded from each of the DNA profiles. Boicken stated that he had no reason to believe that the DNA profiles he tested had been contaminated.

¶ 8        A video was played for the jury from a video visit the defendant had with his brother at the jail. The defendant's brother asked the defendant if he was innocent or if his family could help him. The defendant stated that they could not help him. The defendant also admitted to breaking into the trailer. At the close of the State's evidence, the defendant moved for a directed verdict, which was denied. The defense presented no evidence. In its closing argument, the State said, in part:

3

"And at the end of the day, the defendant's DNA matches the DNA from Sharon's thumb, from the swab from her right breast, and the DNA from *** her fingernail scrapings. She doesn't know him. She's never met him. He has never been in her house, but, lo and behold, he is all over her.

And what are the odds that there's someone else in the world with that DNA profile, the perfect, the complete one, all 23 points underneath her fingernails; the one, that as Lyle Boicken put it, is as good as it gets? Those are the odds, 1 in 20 octillion, 27 zeroes, ladies and gentlemen, 1 in 20 octillion. Those are the chances that there is someone else out there that has that DNA profile. I mean, it has got to be the same odds as being struck by lightning every day for the rest of your life if you live to be a hundred. Astronomical. It's off the charts.

But you know what, even though there is this amazing DNA match, you don't even have to just take the lab's word for it. You saw that video, the video visit. His brother says, well, are you innocent or is there nothing we can do for you? Innocent on one hand, nothing we can do for you on the other. What's the defendant say? There's nothing you can do for me. He chooses this. He doesn't choose innocence. Now, he later backs off, well, I broke in, but I didn't do the other stuff."

¶ 9    After closing arguments, the court instructed the jury, *inter alia*:

"Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and the reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which are not based on the evidence should be disregarded."

4

The jury found the defendant guilty of both counts. The defendant filed a motion for a new trial, which alleged that the State failed to establish a sufficient chain of custody and prove the defendant guilty beyond a reasonable doubt. The court denied the motion. After a sentencing hearing, the defendant was sentenced to consecutive terms of imprisonment of 16 years and 3 years.

¶ 10                                    II. ANALYSIS

¶ 11        On appeal, the defendant solely argues that he was denied a fair trial where the prosecutor misstated evidence during closing arguments. Specifically, the defendant argues that the "State misrepresented evidence by arguing that the chances someone else could have contributed the male DNA profile was so astronomical that it would have the same odds as 'being struck by lightning every day for the rest of your life if you live to be a hundred.' " The defendant states that "the two odds are not remotely comparable and are different by many orders of magnitude. The odds are actually more comparable to being struck by lightning 7 times in ones [*sic*] lifetime."

¶ 12        At the outset, the defendant acknowledges that he did not raise this issue before the trial court but asks that we consider it under the plain error doctrine or find his counsel ineffective for failing to raise it below. Whether we review this case for plain error or for ineffective assistance of counsel, we begin by determining whether an error actually occurred. See *People v. Sargent*, 239 Ill. 2d 166, 189 (2010) ("[the] court typically undertakes plain-error analysis by first determining whether error occurred at all"); *People v. Mahaffey*, 194 Ill. 2d 154, 173 (2000) (noting ineffective assistance of counsel cannot be established where no error occurred), *overruled on other grounds by People v. Wrice*, 2012 IL 111860, ¶ 75.

¶ 13        Prosecutors are allowed great latitude during closing arguments and may comment upon and draw reasonable inferences from the evidence presented but must refrain from improper prejudicial arguments or comments. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Misconduct

5

by a prosecutor warrants a new trial if the improper remarks were a material factor in the conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). The State's conduct is material if, without the remarks, the jury could have reached a contrary verdict. *Id.*

¶ 14        We find no error with the prosecutor's closing arguments. The prosecutor stated that the statistical DNA match "has got to be the same odds as being struck by lightning every day for the rest of your life if you live to be a hundred." This was clearly hyperbole regarding the astronomical odds, as the State went on to say. See *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996) (prosecutorial comments non improper when they were "[a]t worst *** a hyperbolic expression"); *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 44 (prosecutorial comment that "it must have felt like Mt. Everest to the victim" to walk through the courtroom and testify was not improper); *People v. Roe*, 228 Ill. App. 3d 628, 638 (1992) (finding prosecutor's hyperbolic speech not improper). The jury was not meant to take the comment literally. "[J[uries are capable of understanding and appropriately weighing DNA evidence and are constitutionally entrusted to do so. Juries can separate fact from fiction." *People v. Pike*, 2016 IL App (1st) 122626, ¶ 105. Moreover, the court instructed the jury that closing arguments were not evidence, and the jury is presumed to follow the instructions that the court gives it. *People v. Garcia*, 231 Ill. App. 3d 460, 469 (1992); *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). For these reasons, we cannot find that the jury would have reached a contrary verdict if the comments was not made.

¶ 15        As we have found that the prosecutor's comment was not improper, the defendant has failed to establish both plain error and ineffective assistance of counsel. See *People v. Taylor*, 2018 IL App (4th) 140060-B, ¶ 40.

¶ 16                                III. CONCLUSION

¶ 17        The judgment of the circuit court of La Salle County is affirmed.

6

¶ 18       Affirmed.